MR. JUSTICE GULBRANDSON,
dissenting.
I respectfully dissent.
I would affirm the decision of the Workers’ Compensation Court on the basis that there is substantial evidence to support the findings and conclusion of that court.
Judge Reardon, after observing and hearing the testimony of the claimant and considering the depositions of the two medical experts, ruled that the claimant’s incapacities were not produced by the industrial accident of February 14, 1980. In referring to the claimant’s medical condition and the specific incident of the knee injury on February 14, 1980, Dr. Taylor testified as follows:
“Q. During the course of Mr. Kelly’s examination earlier, you were referred to your first report of treatment of Mr. Shepard, and you said that your diagnosis was ‘knee arthritis,’ indicating that you were not particularly impressed *157 with the single incident. Can you describe why? A. I was . . . You are in fact correct. I was not impressed with the single incident, as it was quite clear from clinical findings and x-ray findings that Mr. Shepard had had, in my opinion, a high likelihood of having had badly disorganized knees for some time. In fact, I did not even refer in my initial note and incorrectly so to the fact that he had been recently injured.
“Q. You have indicated to Mr. Shepard and also to Midland Foods that he should probably retire because of the condition of his knees. A. That, and another reason.
“Q. What is the other reason? A. That is something that I have to take exception to Mr. Kelly’s list of fact. I really question as readily as the quitting work of how badly he wants to keep working. He fits ‘the last-straw syndrome.’ That is an elderly man who is working in a relatively, an uneducated elderly man who is working in a fairly uninteresting job who sustains an injury, and that injury can be relatively minor. It is really difficult for that patient to return to work, and for that reason in making that diagnosis of ‘the last-straw syndrome,’ I recommended that he be retired as I felt certain that he would never return to work, in any case.
“Q. Referring then to the first reason, the instability and the long-standing problems with both knees, would that reason alone have been sufficient for you to make that recommendation that he retire? A. Yes.
“Q. Is the left knee, based upon your clinical findings and your x-rays and all of your experience in the same, better or worse condition than the right knee? A. Well, both are in terrible condition, but I would say that the left knee has some retention of joint space medially, and on a scale of one hundred bad points the right knee has one hundred and the left has ninety-nine.
“Q. So actually the left knee is better than the right knee based on what? A. Very marginally.
“Q. That’s all? A. And recall, too, that historically he has *158 pain in his, he has alleged pain in his left knee and that obviously makes it a worse knee.
“Q. You indicated also in answer to a question by Mr. Kelly that the ordinary functions of life are going to continue to aggravate the condition of Mr. Shepard’s knees? A. Yes. This is a relentlously [sic] progressive condition.
“Q. You said that it is a relentlously [sic] progressive condition, and that there are aggravations similar to the one which you presumed occurred on February the 14th, 1980, the industrial accident. And I am asking you to describe what the effect of those aggravations is, or what their nature is. A. That was a specific aggravant, an injury. And these, while they are probably aggravants, are not the kind of things which takes this man to his eventual end, and I think that end must be a crippling end. They are, the things that bring him to that end are the fact that he continues to bear weight; in other words, he gets out of bed in the morning, goes to the bathroom, has breakfast, goes out and works in his yard or goes for a walk or goes fishing or gets in the car and goes down to the grocery store, all of these things involve weight bearing and will mandate relentlous [sic] progression. <<
“Q. Doctor, we take the view that if Mr. Shepard is disabled due to a physical condition at this time, that that disability is one which exists with or without the occurrence of this February 14th, 1980 incident. Do you agree? U
“A. Okay, within a reasonable degree of medical certainty, yes.
“Q. You agree with me? A. Yes. Agree that he would have been, would have retirement within a short period, in any case, as much because of his knees as the other factor that I mentioned. In addition to which, he approaches the normal age for retirement, in any case.”
Dr. Griffin testified by deposition, and hospital records *159 from the Billings Clinic were received in evidence. Those records revealed severe knee problems as early as August, 1972. The radiology report, made in conjunction with claimant’s complaints at that time, stated: “These findings are consistent with advanced degenerative arthritic change.” Dr. Griffin testified as follows:
“[Q.] I’m asking did you see any symptoms of this February 1980 slip and fall on your physical examination of Mr. Shepard? A. Well, the only thing I saw was — evidence of his physical findings was noted; namely, some arthritic changes in both knees.
“Q. And these are things that you had seen going back as far as 1972, correct? A. Correct.
“Q. Including, I think, a reference to the limp as far back as 1977, at least? A. Right. U
“Q. Well, Doctor, in a nutshell, I guess I’m asking whether or not it would be your medical opinion that Mr. Shepard’s impairment with regard to his knees was medically the result of the degenerative arthritis, pseudogout, and chondrocalcinosis, which is of longstanding.
“MR. KELLY: Excuse me. Objected to on the grounds that the question is not phrased in the terms of being within a reasonable degree of medical certainty and is irrelevant and immaterial.
“BY MR. BISHOP:
“Q. And, of course, I’m asking for your opinion within a reasonable degree of medical certainty. A. Well, the answer to your question is yes. U
“Q. Doctor, we have previously taken the deposition of Dr. James Taylor, an orthopedic surgeon here in Billings who you have referred to, also, I see, in your note of December 29, 1981, and Dr. Taylor has testified that he’s not impressed with the single incident of February 1980 as an explanation for the condition of Mr. Shepard’s knees, which Mr. Shepard describes as incapacitating, and I will ask you *160 for your opinion, to a reasonable degree of medical certainty, as to the effect, if any, which you would assign to the February 1980 event which Mr. Shepard has described to you insofar as it relates to the condition of his knees which you have seen from 1972 through December 29, 1981.
“MR. KELLY: Excuse me, Doctor, before you answer. I wish to object upon the grounds that the question exceeds the scope of the cross examination and is improper, irrelevant, immaterial, and incompetent, and does not assume all of the facts, and is an improper hypothetical question.
“MR. BISHOP: In view of the fact that cross examination centered on the question of the claimant’s incapacity and the measuring of that incapacity, I think that this redirect is perfectly within the scope of cross.
“MR. KELLY: I move to strike Counsel’s auditory explanation as not constituting a question.
“BY MR. BISHOP:
“Q. Do you have the question in mind still, Doctor? A. Well, yeah, I think I know what the question is.
“Q. Okay. Why don’t you go ahead and try to answer it, then. A. Well based on my notes and records, I would say that Mr. Shepard’s incapacity related to his arthritis is one of longstanding, and I, since I did not see him at the time of his injury but I did see him in December of 1981, and I would say that his changes were those of chronic degenerative arthritis of the knees, a chronic process.
“Q. What effect or significance, if any, would you assign to the February 1980 slip and fall incident which Mr. Shepard describes? A. From what it sounded like to me, he had a contusion of his knee with a lot of immediate pain and swelling and discomfort.
“Q. From what you saw, did it appear that that had, then, run its course? A. It appeared to be fairly much resolved when I saw him.”
The Workers’ Compensation Court’s decision hinges upon the fundamental principle that compensation is payable only for “injury producing . . . disability.” See sections 39- *161 71-701, 702, and 703, MCA.
In my view, workers’ compensation insurance does have statutory limits. Its benefits should be liberally allowed, but it should not be construed so broadly that it becomes a substitute for general health insurance, pensions, or retirement programs.
This Court recently handed down a decision tacitly approving the State’s commendable program of hiring the handicapped. I fear that the majority decision will provide great incentive to employers to avoid hiring anyone who is in less than perfect health.
I would affirm the Workers’ Compensation Court Judge.